JS - 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TESSA OWEN, individually and on behalf of all others similarly situated<br><br>Plaintiff,<br><br>v.<br><br>L'OCCITANE, INC., and DOES 1 through 10,<br><br>Defendants. | ) CASE NO. CV 12-09841 MMM (JCGx)<br>)<br>)<br>) ORDER GRANTING PLAINTIFF'S<br>) MOTION TO REMAND<br>)<br>)<br>)<br>)<br>)<br>) |

On September 10, 2012, Tessa Owen filed this putative class action in Los Angeles Superior Court against L'Occitane, Inc. ("L'Occitane") and certain fictitious defendants.[1] On November 16, 2012, L'Occitane removed the action, invoking the court's jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d).[2] Owen has now filed a motion to remand.[3] L'Occitane opposes the motion.[4]

---

[1] Notice of Removal ("Removal"), Docket No. 1 (Apr. 4, 2012), Exh. A ("Complaint").

[2] *Id.*, ¶ 1.

[3] Motion to Remand Case to Los Angeles Superior Court ("Motion"), Docket No. 8 (Nov. 26, 2012). See also Reply in Support of Motion to Remand Case to Los Angeles Superior Court

1   Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the

2   court finds the motion suitable for decision without a hearing.

3

4                      **I.  FACTUAL AND PROCEDURAL BACKGROUND**

5       **A.      The Complaint**

6           The complaint alleges claims for negligence, invasion of privacy, unlawful intrusion and

7   violation of the Song-Beverly Credit Card Act, California Civil Code § 1747.08 *et seq.*, a

8   consumer protection statute that prohibits business from soliciting and recording in connection

9   with credit card transactions consumers' personal identifying information ("PII"), such as their

10  addresses and telephone numbers.[5]  Owen alleges that L'Occitane requests and records its

11  consumers' PII in connection with credit card transactions at retail stores,[6] then uses that

12  information for marketing and solicitation purposes unrelated to the transactions.[7]  Owen asserts

13  that L'Occitane sales clerks request that customers provide their PII in a way that suggests

14  provision of the information is mandatory for purposes of the transaction.[8]  Owen alleges that a

15  L'Occitane sales employee asked for her PII (including, but not limited to, her address) in

16  connection with a credit card purchase she made at a retail store in Los Angeles.[9]  The complaint

17  does not specifically allege that L'Occitane asked for and/or recorded the PII in connection with

18  a "loyalty" or "rewards" program.

19          Owen pleads claims for (1) violation of the Song-Beverly Credit Card Act; (2) common

20  ─────────────────────

21  ("Reply"), Docket No. 21 (, 2013).

22      [4]Opposition to Motion to Remand Case to Los Angeles Superior Court ("Opp."), Docket
    No. 19 (Feb. 15, 2013).

23

24      [5]Complaint, ¶ 1.

25      [6]*Id.*

26      [7]*Id.*

27      [8]*Id.*

28      [9]*Id.*, ¶¶ 10-11.

law negligence; (3) invasion of privacy; and (4) unlawful intrusion.  She sues on her own behalf and on behalf of a class of similarly-situated people.  The complaint alleges that "the precise number of consumers at issue[ ] has not been determined," but "Plaintiff believes that Defendant requested and/or recorded [PII] of many hundreds of consumers within the State of California during the relevant time period."[10]

The complaint seeks civil penalties within the range prescribed by § 1747.08(e), "in an appropriate amount to be determined at trial"; compensatory damages "according to proof"; punitive damages; declaratory relief; injunctive relief; restitution and disgorgement of any ill-gotten profits; interest; costs of suit; attorneys' fees under California's Private Attorney General statute, California Code of Civil Procedure § 1021.5 or as otherwise allowed by law; and "such other and further relief as the court deems just and proper."[11]

Owen served the summons and complaint on L'Occitane on September 19, 2012.[12]

**B.     The October 25 Discovery Requests and November 1 Documents**

On October 25, 2012, Owen sent L'Occitane an informal discovery request asking it to produce, among other items, the number of consumers whose PII L'Occitane had collected in California during the limitations period, as well as information concerning L'Occitane's "rewards program."[13]   In response to the discovery request, L'Occitane conducted a preliminary investigation and ascertained that its employees had asked for and obtained the PII of more than 5,000 customers in connection with its "Passport to Provence" loyalty program.[14]   L'Occitane asserts that it instructs employees to record customer PII if the customer indicates he or she would

_____

[10]*Id.*, ¶ 18(A).

[11]*Id.* at 11-12.

[12]Removal, ¶ 4; *id.*, Exh. B.

[13]*Id.*, ¶ 24; see also Declaration of William A. Molinski in Support of Defendant's Opposition to Plaintiff's Motion to Remand ("Molinski Decl."), Docket No. 19-1 (Feb. 15, 2013), Exh. A.

[14]Removal, ¶ 18.

like to join the Passport to Provence program.[15]

On November 1, 2012, Owen sent L'Occitane a letter confirming her position that L'Occitane was liable under the Song-Beverly Act for collecting customer PII in connection with the Passport to Provence program.[16]  That same day, Owen sent L'Occitane a draft joint initial status report, which stated her position that L'Occitane was liable under the Act whether or not its collection of consumer PII was related to the Passport to Provence program.[17]

### C.    Notice of Removal

L'Occitane removed the action to this court on November 16, 2012, invoking the court's jurisdiction under CAFA.  The  notice of removal alleges that the diversity requirement set forth in 28 U.S.C. § 1332(d)(2) is met because Owens is a California resident, and L'Occitane is a New York corporation.[18]

L'Occitane acknowledges that the complaint does not allege a specific total amount in controversy.[19]  To demonstrate that the amount in controversy requirement is satisfied, it cites other cases where civil penalties have been awarded under § 1747.08(e) to show that the penalty can be as much as $1,000 per violation.[20]   L'Occitane asserts that the court can determine that the amount in controversy exceeds the $5,000,000 jurisdictional threshold set forth in § 1332(d) by multiplying the $1,000 per violation civil penalty available under § 1747.08(e) by the number

---

[15]*Id.*, ¶ 18.

[16]Molinski Decl, Exh. B.

[17]*1.    Id.*, Exh. C.  Contrary to L'Occitane's suggestions, the November 1 documents do not demonstrate that Owen's claims are based exclusively on the Passport to Provence program.  (See *id.* at 26 ("Plaintiff . . . disputes that Defendant collects information solely for purposes of its purported rewards program"); Opp. at 19-23.)  This does not affect the court's analysis as to whether removal was timely, however, for the reasons stated herein.

[18]Removal, ¶ 14.

[19]*Id.*, ¶ 15.

[20]*Id.*, ¶ 17.

of customers who have participated in the Passport to Provence program, which exceeds 5,000.

## II.  DISCUSSION

### A.    Legal Standard Governing Removal Jurisdiction

The right to remove a case to federal court is entirely a creature of statute.  See *Libhart v. Santa Monica Dairy Co.*, 592 F.2d 1062, 1064 (9th Cir. 1979).  The removal statute, 28 U.S.C. § 1441, allows defendants to remove when a case originally filed in state court presents a federal question or is between citizens of different states.  See 28 U.S.C. §§ 1441(a), (b).  Only state court actions that could originally have been filed in federal court may be removed.  28 U.S.C. § 1441(a) ("Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending"); see *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987); *Ethridge v. Harbor House Rest.*, 861 F.2d 1389, 1393 (9th Cir. 1988).

In 2005, Congress enacted the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4.  CAFA gives district courts original jurisdiction to hear class actions "in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs," and "in which[, *inter alia*,] any member of a class of plaintiffs is a citizen of a State different from any defendant."  28 U.S.C. § 1332(d)(2); see also *Luther v. Countrywide Homes Loans Servicing LP*, 533 F.3d 1031, 1033-34 (9th Cir. 2008) ("The Class Action Fairness Act of 2005 § 4(a), 28 U.S.C. § 1332(d)(2), amended the requirements for diversity jurisdiction by granting district courts original jurisdiction over class actions exceeding $5,000,000 in controversy where at least one plaintiff is diverse from at least one defendant.  In other words, complete diversity is not required.  CAFA also provided for such class actions to be removable to federal court.  See 28 U.S.C. § 1453(b).  CAFA was enacted, in part, to 'restore the intent of the framers of the United States Constitution by providing for Federal court consideration of interstate cases of national importance under diversity jurisdiction.'  Pub.L. No. 109-2, § 2(b)(2), 119 Stat. 4,

5 (codified as a note to 28 U.S.C. § 1711)").

Parties seeking to remove must comply with certain procedural mandates. Among these is a requirement that a notice of removal be filed within thirty days after service of the summons and complaint. 28 U.S.C. § 1446(b); see *Murphy Brothers, Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354 (1999). The statute provides for a renewed thirty-day removal period if the original complaint is not removable. This period commences upon defendant's receipt of "an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable . . . ." 28 U.S.C. § 1446(b).

The removing defendant bears the burden of establishing that removal is proper. See *Gaus v. Miles*, 980 F. 2d. 564, 566 (9th Cir. 1992); *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1195 (9th Cir. 1988) (citing *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97 (1921)); see also *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 403-04 (9th Cir. 1996) (when removing a case to federal court, defendants bear the burden of proving, by a preponderance of the evidence, actual facts sufficient to support jurisdiction). The removal statute is strictly construed against removal, and all doubts respecting jurisdiction are resolved in favor of remand. *Gaus*, 980 F.2d at 566; *Libhart*, 592 F.2d at 1064.

In *Harris v. Bankers Life and Casualty Co.*, 425 F.3d 689 (9th Cir. 2005), the Ninth Circuit clarified certain ambiguities regarding the timely removal requirement. It held:

> "The statute provides two thirty-day windows during which a case may be removed – during the first thirty days after the defendant receives the initial pleading or during the first thirty days after the defendant receives a paper 'from which it may first be ascertained that the case is one which is or has become removable' if 'the case stated by the initial pleading is not removable.'
>
> Three removal scenarios are presented in a potential diversity case: 1) the case clearly is removable on the basis of jurisdictional facts apparent from the face of the complaint. . . ; 2) the case clearly is not removable on the basis of jurisdictional facts apparent from the face of the complaint . . . ; or 3) it is unclear from the complaint whether the case is removable . . . . This latter scenario [is] sometimes

referred to as an 'indeterminate' pleading. . . ." *Id.* at 692-93 (quoting 28 U.S.C. § 1446(b)).

In *Harris*, the initial state court pleading did not set forth the citizenship of one defendant. The question, which had been a question on which circuits had disagreed, but on which the Ninth Circuit had not spoken, was whether any burden "lies with the defendant to investigate the necessary jurisdictional facts within the first thirty days of receiving an indeterminate complaint, or whether the determination be limited to the face of the initial pleading." *Id.* at 693.

The Ninth Circuit concluded that

"notice of removability under § 1446(b) is determined through examination of the four corners of the applicable pleadings, not through subjective knowledge or a duty to make further inquiry. Thus, the first thirty-day requirement is triggered by defendant's receipt of an 'initial pleading' that reveals a basis for removal. If no ground for removal is evident in that pleading, the case is 'not removable' at that stage. In such case, the notice of removal may be filed within thirty days after the defendant receives 'an amended pleading, motion, order or other paper' from which it can be ascertained from the face of the document that removal is proper." *Id.* at 694.

As can be seen, *Harris* plainly contemplates two thirty-day windows. The first commences with service of the initial complaint in state court. In a case that is not removable based on the initial complaint, "if it is rendered removable by virtue of a change in the parties or other circumstance revealed in a newly-filed 'paper,' then the second thirty-day window is in play." *Id.*[21] In *Harris*,

---

[21]The *Harris* court discussed in detail the Fourth Circuit's opinion in *Lovern v. General Motors Corp.*, 121 F.3d 160 (4th Cir. 1997). It noted that, "[i]n rejecting the defendant's subjective knowledge as a test for notice, the Fourth Circuit emphasized reliance on 'the four corners of the initial pleading or subsequent paper.'" *Harris*, 425 F.3d at 695 (quoting *Lovern*, 121 F.3d at 162). In *Lovern*, the Fourth Circuit held that it would "allow the court to rely on the face of the initial pleading and on the documents exchanged in the case by the parties to determine when the defendant had notice of the grounds for removal, requiring that those grounds be apparent within the four corners of the initial pleading or subsequent paper." *Id.* (quoting *Lovern*, 121 F.3d at 162).

plaintiff sent a letter indicating his intention to abandon suit against the defendant whose citizenship was unknown; the court held that the letter was a "paper" that triggered the second thirty-day window.[22]

The *Harris* court identified two concerns with a rule that required a defendant to remove based on its subjective knowledge of jurisdictional facts or that imposed a duty of inquiry on the defendant. First, the court feared that requiring a defendant to act on its subjective knowledge would spawn collateral litigation or "'mini-trial[s] regarding who knew what and when.'" *Id.* at 695, 697 (quoting *Lovern*, 121 F.3d at 162). "Second, the court was concerned that relying on the defendant's subjective knowledge or efforts to discover whether jurisdiction existed apart from the complaint would encourage premature removals by a defendant afraid of waiving [its] right to remove." *Cretian v. Job1USA, Inc.*, No. CV-09-770-ST, 2009 WL 4841039, *4 (D. Or. Dec. 11, 2009) (citing *Harris*, 425 F.3d at 697). "[T]he court noted that 'a bright-line approach'" served the jurisdictional and procedural interests of bringing certainty and predictability to the process, avoiding gamesmanship in pleading, and 'avoid[ing] the spectre of inevitable collateral litigation over whether the pleadings contained a sufficient "clue," whether defendant had subjective knowledge, or whether defendant conducted sufficient inquiry.'" *Sweet v. United Parcel Service, Inc.*, No. CV 09-02653 DDP (RZx), 2009 WL 1664644, *4 (C.D. Cal. June 15, 2009) (quoting *Harris*, 425 F.3d at 697).

**B.    Whether the Initial Complaint Demonstrated the Action Was Removable**

The parties' dispute concerns whether L'Occitane has demonstrated that removal was

---

[22]The *Harris* court relied heavily on the Ninth Circuit's prior decision in *Cantrell v. Great Republic Insurance Co.*, 873 F.2d 1249 (9th Cir. 1989). There, plaintiff filed a suit completely preempted by the Employee Retirement Income Security Act ("ERISA"). It was removed based on an amended complaint. The only difference between the original and amended pleadings was that in the amended complaint, plaintiff sued in a representative capacity and added an additional defendant. Without conceding that either complaint supported federal question jurisdiction, plaintiff asserted that if the amended complaint was removable, the original complaint was as well. *Id.* at 1254. The Ninth Circuit agreed, concluding that the changes made by plaintiff in the amended complaint did not render it "an amended pleading . . . from which it *first* may be ascertained that the case is one which is or has become removable." *Id.* at 1255 (emphasis original).

timely.[23]  Owen argues the court should remand the action because L'Occitane did not file a notice of removal until more than thirty days after he served the summons and complaint on September 19, 2012.  If L'Occitane could have determined from the "four corners" of the complaint that this action was removable, then its removal was untimely.  28 U.S.C. § 1446(b)(1) ("The notice of removal of a civil action or proceeding shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based"); see also *Murphy Brothers*, 526 U.S. at 354; *Harris*, 425 F.3d at 694.

L'Occitane argues that it was not clear from the complaint that the case was removable because the complaint is an "indeterminate pleading."  Specifically, it asserts that it could not determine from the complaint that the case met CAFA's amount in controversy requirement.  As L'Occitane notes, the complaint does not allege a specific amount in controversy.  Owen counters that the complaint's request for statutory penalties under the Song-Beverly Act, coupled with the class allegations, reveal an amount in controversy that clearly exceeds $5,000,000.  He asserts that a Song-Beverly Act class action automatically puts all credit card transactions processed by a defendant during the limitations period at issue, whether or not each transaction violated § 1747.08(a).  In support of this argument, Owen cites cases in which courts concluded that they had jurisdiction to hear Song-Beverly Act actions because the defendant showed that multiplying the maximum penalty available under the Act ($1,000) by the total number of credit card transactions the defendant processed during the period in dispute produced a number that exceeded $5,000,000.  See *Morey v. Louis Vuitton N. Am., Inc.*, 461 Fed. Appx. 642, 643 (9th Cir. Dec. 15, 2011) (Unpub. Disp.); *Korn v. Polo Ralph Lauren Corp.*, 536 F.Supp.2d 1199, 1205-06 (E.D. Cal. 2008).  In the cases on which Owen relies, however, the defendants removed within thirty days after service and adduced evidence extrinsic to the complaint showing the number of credit card transactions processed during the applicable time period.  See, e.g., *Korn*, 536

---

[23]Owen does not appear to dispute that the diversity and amount in controversy requirements of § 1332(d) are satisfied.  He merely challenges the timeliness of removal.

F.Supp.2d at 1206 ("In order to demonstrate that the amount in controversy meets the CAFA's jurisdictional requirement, defendant need only demonstrate that there are at least 5,001 putative class claims. Defendant has done so. Defendant has submitted the declaration of Jurgens, Director of Sales Audit for defendant, which provides that defendant processed more than 5,000 credit card transactions over the last year in the state of California"). *Morey* and *Korn* do not address when or whether a Song-Berverly Act complaint can reveal an amount in controversy exceeding $5,000,000 *on its face*,[24] and Owen cites no authority for the proposition that merely pleading a Song-Beverly Act class action claim, without more, demonstrates that CAFA jurisdiction exists.

The complaint does not allege a specific number of credit card transactions. It does not, therefore, specify a number that L'Occitane could multiply by $1,000 to determine whether the amount in controversy exceeded $5,000,000. Owen argues that the class definition in the complaint reveals that the class is sufficiently large that the requisite amount is in controversy.

---

[24]A defendant can remove a complaint during the initial thirty-day window even if the complaint does not allege the amount of damages sought, so long as it can adduce evidence that the amount in controversy exceeds the statutory minimum. *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 404 (9th Cir. 1996) ("we hold that in cases where a plaintiff's state court complaint does not specify a particular amount of damages, the removing defendant bears the burden of establishing, by a preponderance of the evidence, that the amount in controversy exceeds [the statutory minimum]"); *Faulkner v. Astro-Med, Inc.*, No. C 99-2562 SI, 1999 WL 820198, *2 (N.D. Cal. Oct. 4, 1999) ("If the complaint does not specify a damages amount, the court can look at facts in the complaint and require the parties to submit evidence relevant to the amount in controversy," citing *Conrad Associates v. Hartford Accident & Indem. Co.*, 994 F.Supp. 1196, 1198 (N.D. Cal. 1998)). Under these circumstances, a defendant must submit "summary-judgment-type evidence" to establish the actual amount in controversy. *Singer*, 116 F.3d at 377 (citing *Allen v. R & H Oil & Gas Co.*, 63 F.3d 1326, 1335-36 (5th Cir. 1995)); see also *Matheson v. Progressive Specialty Ins. Co.*, 319 F.3d 1089, 1090 (9th Cir. 2003).

If a defendant does not remove within the first thirty days after services, however, *Harris* controls. A second thirty-day window does not open unless and until the defendant receives "an amended pleading, motion, order or other paper" from which it can be ascertained that removal is proper. *Harris*, 425 F.3d at 694. Thus, whether a defendant has adduced sufficient evidence of the amount in controversy to remove an indeterminate complaint within the first thirty-day window is a different inquiry than whether an "other paper" reveals the amount in controversy and opens a second thirty-day window. *Morey* and *Korn* address only the former question, and Owen erroneously relies on those cases to argue that the initial complaint in this case revealed the amount in controversy on its face.

1  The complaint defines the class as

2  "All persons who purchased merchandise with a credit card at a L'Occitane, Inc.

3  store in California during the Class Period who were requested to and did provide

4  personal identification information, including but not limited to their physical

5  address, e-mail address, telephone number, and/or zip code, which was then

6  recorded by a L'Occitane, Inc. employee in conjunction with the credit  card

7  transaction, other than exclusively for shipping and delivery purposes."[25]

8  Owen contends that this definition enabled L'Occitane to examine its records and determine that

9  the likely class size placed more than $5,000,000 at issue under the Song-Beverly Act.

10  Citing *Harris*, L'Occitane argues that it had no duty to conduct an independent

11  investigation to determine, within thirty days of receiving the complaint, whether it had collected

12  PII from enough consumers or processed enough credit card transactions that CAFA's

13  jurisdictional minimum was satisfied.  The court agrees.  In *Harris*, the Ninth Circuit "considered

14  and rejected the proposition that a defendant has a duty to investigate – in its own records or

15  otherwise – a basis for removal when the pleading does not disclose one on its face.  It also

16  rejected the suggestion that the defendant's subjective knowledge or a 'clue' in the complaint

17  might trigger the thirty-day clock."   *Sweet*, 2009 WL 1664644 at *3. The class definition

18  allegations in the complaint do not affirmatively establish the class size; at best, they provide

19  "clues" that CAFA's amount in controversy requirement is satisfied.  *Harris* clearly holds that this

20  is not enough to trigger the first 30-day removal period under § 1446(b).

21  Owen counters that *Harris* does not support L'Occitane's position, citing *Banta v. Am.*

22  *Med. Response, Inc.*, No. 11-03586 GAF, 2011 WL 2837642 (C.D. Cal. July 15, 2011).  In

23  *Banta*, the district court held that "even after *Harris*, a defendant may be required to remove

24  within 30 days of receipt of the complaint where the allegations of the initial pleading make it

25  evident that the amount in controversy meets the jurisdictional requirement. . . . [I]f a defendant

26  may remove the case to federal court within 30 days of receipt of the pleading, then the defendant

27

28  [25]*Id.*, ¶ 16.

11

1   must remove the action or be procedurally barred from removing the case." *Id.* at *7.

2       The complaint in *Banta* did not identify the amount of controversy, but alleged the
3   existence of a class consisting of all of defendants' California employees during the applicable
4   limitations period.  The court concluded that defendants were required to remove within thirty
5   days of receiving the complaint "[g]iven that [they] purportedly kn[ew]  how many persons they
6   employ[ed] and how much they [we]re paid," and were thus "on notice that the amount in
7   controversy (whether or not it could be proven) was a very large sum of money." *Id.*

8       As the *Banta* court itself recognized, however, California district courts have generally
9   concluded that the initial 30-day deadline set forth in § 1446(b)(1) is *not* triggered under such
10  circumstances.  See *id.* at 6 n. 5 ("The Court recognizes that some district courts have concluded
11  that, in circumstances like those present in this case, the second paragraph applies. . . .  Those
12  cases, however, are not controlling and the Court does not find them persuasive").  In *Rico-Chinn*
13  *v. Prudential Ins. Co. of America*, No. C-05-01975 MMC, 2005 WL 1632289 (N.D. Cal. July
14  12, 2005), for example, the plaintiff argued that removal was untimely because the insurer could
15  have ascertained the amount in controversy at the time her complaint was filed.  The complaint
16  did not specify the amount of damages, but plaintiff argued defendant could easily have calculated
17  the amount of her past monthly insurance payments from its records.  The court rejected this
18  argument and held that removal was timely.  *Id.* at *3 ("[B]ecause plaintiff's complaint did not
19  reveal on its face the removability of the instant action, the 30-day period did not commence by
20  virtue of plaintiff's service of the complaint on defendant"); see also *id.* at *2 ("Of the five circuit
21  courts of appeals to have addressed the issue, . . . all have held that the thirty day time period . . .
22  starts to run from defendant's receipt of the initial pleading only when that pleading affirmatively
23  reveals on its face that the plaintiff is seeking damages in excess of the minimum jurisdictional
24  amount of the federal court").

25      In *Molina v. Lexmark Int'l, Inc.*, No. CV 08-04796 MMM (FMOx), 2008 WL 4447678
26  (C.D. Cal. Sept. 30, 2008), the plaintiff argued that the defendant could have used an "obvious
27  formula" to calculate the amount in controversy using its own employee records.  The court
28  rejected plaintiff's argument, citing *Rico-Chinn* and *Harris*.  *Id.* at *18.  The court held that "even

if Lexmark could have ascertained that the amount in controversy exceeded $5 million by reviewing its own records . . . this would not have triggered the thirty day period for removal under § 1446(b)" because the amount in controversy was not specified in the complaint. *Id.* at *18. Similarly, in *Munoz v. J.C. Penney Corp., Inc.*, No. CV09-0833 ODW (JTLx), 2009 WL 975846 (C.D. Cal. Apr. 9, 2009), the plaintiff asserted that defendants' own filings with the Securities and Exchange Commission provided the information necessary to ascertain that the case was removable. The court rejected the contention that defendants had a duty to perform "grade-school mathematics" based on their filings to determine whether the amount in controversy requirement was met. *Id.* at *2 (citing *Rico-Chinn*, 2005 WL 1632289 at *2).

The court need not choose between these disparate approaches, however, because the circumstances presented in this case are distinguishable from those in *Banta*. Owen's complaint is not silent on the size of the putative class; it alleges a class that is likely composed of "hundreds" of individuals. Accepting the estimated class size alleged in the complaint as true, the amount of controversy is at most $1,000,000, less than CAFA's jurisdictional minimum.[26] As a consequence, it is not "evident" from the face of the complaint, as it was in *Banta*, that the class is sufficiently large that it could result in a damages award in excess of CAFA's minimum jurisdictional amount. Even if a defendant must remove an indefinite complaint within thirty days if it can readily ascertain removability from information in its sole possession, it should not be required to ascertain removability based on information in its possession that contradicts the facts alleged in the complaint and remove within thirty days after service. The court concludes, therefore, that the complaint Owen filed on September 10, 2012 did not trigger the initial 30-day removal period set forth in § 1446(b).

### C.    Whether this Case Is Removable Based on Defendant's Receipt of an  Amended Pleading, Motion, Order or Other Paper

Owen next argues that L'Occitane never received an "other paper" from which it could be

---

[26]Given the amount of Song-Beverly Act civil penalties on which both parties rely – $1,000 – civil penalties would be $1,000,000 if there were 1,000 class members.

13

ascertained that removal was proper.  Under *Harris*, defendants must "point to their receipt of any 'paper' that would trigger the extended 30-day removal period."  *Kohan Productions Ltd. v. Comerica Bank*, No. CV 10-0034 PSG (AJWx), 2010 WL 956402, *4 (C.D. Cal. Mar. 11, 2010).  Without such a paper, removal is premature.  *B.C. v. Blue Cross of Cal.*, No. CV 11–08961 GAF, 2012 WL 12782, *7 (C.D. Cal. Jan. 3, 2012) ("[R]emoval filed before a plaintiff has served a paper on the defendant demonstrating removability is premature.  That rule squares the plain language of § 1446(b) with the Ninth Circuit's holding in *Harris* without creating an unlimited time frame within which a defendant is able to remove to federal court"); *Adelpour v. Panda Express, Inc.*, No. CV 10-02367 MMM, 2010 WL 2384609, *5 (C.D. Cal. June 8, 2010) (citing *Rossetto v. Oaktree Capital Management, LLC*, 664 F.Supp.2d 1122, 1129 (D. Haw. 2009) ("Defendants' request for removal was premature rather than untimely.  The thirty-day removal period has not yet begun because Plaintiff's Complaint did not contain adequate grounds to trigger removal and no additional pleadings or papers, as defined by 28 U.S.C. § 1446(b), have provided subsequent grounds for removal")); see also *Abrego Abrego v. The Dow Chemical Co.*, 443 F.3d 676, 691-92 (9th Cir. 2006) ("Dow removed this action to district court a mere seven days after the workers filed their First Amended Complaint, and less than a month after the case was filed.  Once in federal court, Dow failed to present to the district court any pleading, evidence, or admission that establishes that it is more likely than not that jurisdiction lies.  On these facts, it is well within the court's discretion to remand to state court rather than ordering jurisdictional discovery, with the knowledge that later-discovered facts may prompt a second attempt at removal.  Doing so avoids encouraging the sort of premature removal presented to us here").

The requirement that the removing defendant receive a pleading or "other paper" means that the "document that triggers the thirty-day removal period cannot be one created by the defendant." *Rossetto*, 664 F.Supp.2d at 1129.  Thus, "the 'amended pleading, motion, order or other paper' must derive from 'either the voluntary act of the plaintiff in the state court, or other acts or events not the product of the removing defendant's activity.'" *Smith v. Int'l Harvester Co.*, 621 F.Supp. 1005, 1007 (D. Nev. 1985) (quoting *Potter v. Carvel Stores of New York, Inc.*,

203 F.Supp. 462, 467 (D. Md. 1962)). See also *Addo v. Globe Life & Accident Ins. Co.*, 230 F.3d 759, 762 (5th Cir. 2000) ("[T]he 'other paper' must result from the voluntary act of a plaintiff which gives the defendant notice of the changed circumstances which now support federal jurisdiction").

L'Occitane contends that the informal discovery requests it received on October 25, 2012 were "other papers" from which it was able to ascertain that removal was proper.  It asserts that the requests were the first time Owen mentioned a "reward program" in writing.  L'Occitane also argues that the letter and joint status report it received on November 1 are "other papers" that revealed removability.  It asserts that the November 1 letter and draft status report clearly outlined, for the first time, Owen's belief that L'Occitane's liability would be based on the Passport to Provence enrollment process.  L'Occitane does not contend that any of the documents it received on October 25 or November 1 specified an amount in controversy.

Based on its review of the October 25 discovery requests and the November 1 documents, the court disagrees with L'Occitane's characterization of them.  While both the discovery requests and the letter and draft status report clearly mention L'Occitane's reward and loyalty programs, they do not state that Owen's theory of liability rests on the Passport to Provence program, nor do they limit the putative class to individuals who enrolled in that program.  Most of the October 25 discovery requests ask L'Occitane to produce information concerning *all* credit card transactions and collections of PII during the limitations period.[27]  The November 1 documents, in fact, specifically eschew the idea that the class is limited to individuals who enrolled in the Passport to Provence program.  The draft status conference report states, for example: "Plaintiff also dispute that Defendant collects information solely for purposes of its purported rewards program. . . ."[28]  While L'Occitane disputes Owen's allegations that its employees record customer PII in any other context, Owen has not limited her claims to the Passport to Provence program, either in the initial complaint, or in any subsequent filing. The October 25 and

---

[27]See Molinski Decl., Exh. A.

[28]*Id.*, Exh. C.

November 1 papers do not, therefore, reveal a class size that is any larger or smaller than the class alleged in the initial complaint.

As stated, the complaint defines the class as "[a]ll persons who purchased merchandise with a credit card at a L'Occitane, Inc. store in California during the Class Period who were requested to and did provide personal identification information . . . which was then recorded by a L'Occitane, Inc. employee in conjunction with the credit card transaction, other than exclusively for shipping and delivery purposes."[29]  This definition clearly encompasses individuals who provided their PII to L'Occitane for the purpose of enrolling in the Passport to Provence program after making a credit card purchase at a L'Occitane store – whether or not L'Occitane is ultimately liable for recording the PII of those individuals.  To the extent the October 25 and November 1 papers put L'Occitane on notice of relevant jurisdictional facts, therefore, those facts were already alleged in the original complaint.  See *Adelpour*, 2010 WL 2384609 at *3.

The court addressed an analogous situation in *Adelpour*.  There, the original complaint defined the class as "all California residents who abstain[ed] from consuming animal flesh" and who purchased certain products from a Panda Express restaurant during the class period.  *Id.* at *1.  The amended complaint defined a class that included "all California residents who purchase[d] vegetarian or meat-free dishes" and who purchased such products from a Panda Express restaurant during the class period.  *Id.*  Defendants asserted that the amended complaint "permitted them to investigate their own financial records and tally the profits generated . . . during the class period" to arrive at an amount in controversy meeting the jurisdictional requirement.  *Id.* at *5.  The court concluded that defendants had not identified an "other paper" that triggered the second 30-day removal period under §1446(b), because the class allegations on which defendant relied in "tallying" the amount in controversy were already in the original complaint.  Without some "other paper" revealing a new basis for jurisdiction, the court stated, defendant's investigation did not trigger a second 30-day removal period.   It explained:

"This type of internal investigation would represent no more than defendants'

---

[29]FAC, ¶ 10.

1    subjective belief about the amount in controversy based on knowledge in their
2    possession.  It is not information drawn from the four corners of any pleading or
3    other paper received from plaintiff.  Moreover, to credit this argument, the court
4    would have to engage in a mini-trial to determine if a similar internal financial
5    investigation would have put defendants on notice at the time the original complaint
6    was filed that the amount in controversy exceeded $5,000,000.  This is precisely
7    the inquiry *Harris* precludes." *Id.*

8    The same reasoning applies to the L'Occitane's arguments in this case.

9          In essence, L'Occitane asserts that the action became removable once its own investigation
10   revealed that the class likely consisted of more than 5,000 persons.  The results of L'Occitane's
11   investigation, however, were not included in Owen's October 25 requests or the documents she
12   sent L'Occitane on November 1.  Furthermore, it was L'Occitane that calculated the number of
13   Passport to Provence participants; the number did not derive from voluntary action by Owen.  For
14   these reasons, the information developed through L'Occitane's investigation did not trigger the
15   second 30-day removal period under § 1446(b).  See *Rossetto*, 664 F.Supp.2d at 1129; see also
16   *Smith*, 621 F.Supp.at 1007.   As L'Occitane has identified no "other paper" from which it can be
17   ascertained that the amount in controversy requirement is satisfied here, the court concludes that
18   its removal wa premature.  See, e.g., *B.C.*, 2012 WL 12782 at *7; *Kohan Productions*, 2010 WL
19   956402 at *4; *Adelpour*, 2010 WL 2384609 at *5; *Rossetto*, 664 F.Supp.2d at 1129.

20         **D.    Owen's Motion for Attorneys' Fees**

21         A court that remands a case to state court based on improper removal has the discretion
22   to "award payment of just costs and any actual expenses, including attorney fees, incurred as a
23   result of the removal." 28 U.S.C. § 1447(c); *Gardner v. UICI*, 508 F.3d 559, 561 (9th Cir.
24   2007). "Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only
25   where the removing party lacked an objectively reasonable basis for seeking removal.
26   Conversely, when an objectively reasonable basis exists, fees should be denied." *Martin v.*
27   *Franklin Capital Corp.*, 546 U.S. 132, 141(2005); *Patel v. Del Taco, Inc.*, 446 F.3d 996, 999
28   (9th Cir. 2006) (upholding fee award under § 1446(c) where the removal was "frivolous").

1    Although L'Occitane's removal lacked merit, it appears that it relied in good faith on the Ninth

2    Circuit's decision in *Harris* to remove the case on the basis of what it erroneously – but not

3    completely unreasonably – considered an "other paper" revealing removability.  See *Harris*, 425

4    F.3d at 694 ("the notice of removal may be filed within thirty days after the defendant receives

5    'an amended pleading, motion, order or other paper' from which it can be ascertained from the

6    face of the document that removal is proper").[30]   Consequently, the court in its discretion denies

7    the request for fees.  See, e.g., *B.C.*, 2012 WL 12782 at *7; *Kohan Productions*, 2010 WL

8    956402 at *5.

9

10                                    **III.  CONCLUSION**

11           For the reasons stated, the court concludes that it lacks jurisdiction to hear this action.  The

12   court directs the clerk to remand the case to Los Angeles Superior Court forthwith.  Owen's

13   request for attorneys' fees is denied.

14

15   DATED: March 8, 2013

16                                        MARGARET M. MORROW
                                          UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23       [30]The "other paper" in *Harris* consisted of a letter sent by plaintiff's counsel to the defense
     attorney, which opposed any efforts to continue the trial date.  Because the non-diverse co-
24   defendant had not yet been served at that point, defense counsel concluded that plaintiff had
     effectively abandoned his claims against him because "the current deadlines set in the State Court
25   Action would not be achievable" if plaintiff intended to pursue claims against the co-defendant.
     Thus, although the "other paper" in *Harris* enabled defendant to conclude that there was complete
26   diversity without conducting an independent investigation, defendant was required to make certain
     logical deductions to arrive at that conclusion.  L'Occitane could reasonably have concluded,
27   based on *Harris*, that it could consider Owen's letter "other paper," and conduct independent
     analysis to determine that the amount in controversy exceeded CAFA's jurisdictional minimum.
28

                                              18